CHARLES O. SHEPHERD et al., Appellants, *v.* THE MOUNT VERNON TRUST COMPANY, Respondent.

(Argued October 23, 1935; decided November 20, 1935.)

*Harold M. Edwards* and *Frank H. Connelly, Jr.*, for appellants. The statute unlawfully impairs the obligation of a contract and deprives appellants of their property without due process of law. (*Matter of Delaney*, 256 N. Y. 315; *Matter of Holden*, 264 N. Y. 215; *Hendrickson* v. *Apperson*, 245 U. S. 105; *Poindexter* v. *Greenhow*, 114 U. S. 270; *Dahnke-Walker Milling Co.* v. *Bondurant*, 257 U. S. 282; *Doty* v. *Love*, 295 U. S. 64; *Hoff* v. *First State Bank*, 174 Minn. 36; *McConville* v. *Fort Pierce Bank & Trust*

*Co.,* 101 Fla. 727; *Farmers' Bank* v. *Tomlinson,* 55 S. D. 185; *Hessen Siak Shams* v. *Nebraska State Bank,* 48 Fed. Rep. [2d] 894; *Engelecke* v. *Farmers' State Bank,* 246 N. W. Rep. 288; *Island City Savings Bank* v. *Sachtleben,* 67 Tex. 420; *Rumble* v. *Tyns,* 123 Ga. 295; *Sliosberg* v. *N. Y. Life Ins. Co.,* 244 N. Y. 482; *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398; *Worthen Co.* v. *Thomas,* 292 U. S. 426; *Worthen Co.* v. *Kavanaugh,* 295 U. S. 56; *Louisville Joint Stock Land Bank* v. *Radford,* 295 U. S. 555; *Matter of Prudential Outfitting Co.,* 250 Fed. Rep. 504; *Lynch* v. *United States,* 292 U. S. 571.) Appellants are not estopped from attacking the constitutionality of the plan because they have received a sum equal to fifty-five per cent of their withheld balance. (*Wills* v. *Investors Bankstocks Corp.,* 257 N. Y. 451; *Mellen* v. *Mellen,* 137 N. Y. 606.)

*Clinton T. Taylor* and *James D. Hopkins* for respondent. Neither section 61-a of the Banking Law (Cons. Laws, ch. 2) or the plan of reorganization of the defendant in any respect impairs the obligation of contract or deprives the appellants of their property without due process of law. (*Brown Holding Co.* v. *Feldman,* 256 U. S. 170; *People* v. *Nebbia,* 262 N. Y. 259; 291 U. S. 502; *Hoff* v. *First State Bank,* 174 Minn. 236; *Paul* v. *Farmers & Merchants State Bank,* 245 N. W. Rep. 832; *McConville* v. *Fort Pierce Bank & Trust Co.,* 135 So. Rep. 392; *Becker* v. *Amos,* 141 So. Rep. 136; *Dorman* v. *Dell,* 52 S. W. Rep. [2d] 892; *Milner* v. *Gibson,* 61 S. W. Rep. [2d] 273; *Smith* v. *Tetley,* 225 N. W. Rep. 307; *Nagel* v. *Ghingher,* 171 Atl. Rep. 65; *Timmons* v. *People's Tr. Co.,* 173 S. E. Rep. 79; *Warsaw Malt Products Co.* v. *Citizens State Bank,* 254 N. W. Rep. 379; *Matter of Citizens Sav. Bank,* 30 Ohio W. P. W. S. 271; *Felter* v. *Bank of Leipsic,* 31 Ohio [N. S.] 241; *Dunn* v. *Love,* 155 So. Rep. 331; *Doty* v. *Love,* 295 U. S. 64; *Matter of Chicago R. I. & P. R. Co.,* 55 Sup. Ct. 595; *Hadacheck* v. *Sebastian,* 239 U. S. 394; *Atlantic Coast Line R. R. Co.* v. *Goldsboro,* 232 U. S. 548;

*Matter of Morse*, 247 N. Y. 290; *Dyer* v. *Broadway Central Bank*, 225 App. Div. 366; *Canada Southern Ry. Co.* v. *Gebhard*, 109 U. S. 527; *Gibbes* v. *Zimmerman*, 290 U. S. 326; *Gilfillan* v. *Union Canal Co.*, 109 U. S. 401; *Matter of People* [*Title & Mortgage Guarantee Co.*], 264 N. Y. 69; *Moses* v. *Guarantee & Mortgage Co.*, 264 N. Y. 476; *Levy Leasing Co.* v. *Siegel*, 230 N. Y. 634; 258 U. S. 242; *Block* v. *Hirsh*, 256 U. S. 135.) The appellants are estopped from attacking the constitutionality and the plan of reorganization. (*Clay* v. *Smith*, 28 U. S. 411; *Daniels* v. *Tearney*, 102 U. S. 415; *Musco* v. *United Surety Co.*, 196 N. Y. 459; *Bridgeport Construction Co.* v. *Duffey*, 106 Misc. Rep. 252; *Eustis* v. *Bolles*, 146 Mass. 413; 150 U. S. 361.)

LEHMAN, J. In March, 1933, all the banks of the State were temporarily closed by proclamation of the Governor of the State and of the President of the United States. On March 24, 1933, the defendant bank was permitted to reopen, but subject to restrictions imposed by the Superintendent of Banks of the State of New York. At that time the plaintiffs maintained a deposit account in their joint names in the defendant bank. They collected ten per cent of the amount on deposit. The restrictions imposed by the Superintendent of Banks precluded the plaintiffs from collecting more at that time. The sum of $3,196.40 still remained in their deposit account. It could be collected from the bank only if the Superintendent of Banks should thereafter determine that the bank should be permitted to do business without restrictions; otherwise it could be collected only upon liquidation of the bank by the Superintendent of Banks, in so far as the funds in his hands might prove sufficient to pay the creditors of the bank.

While the bank was conducting its business under the restrictions imposed by the Superintendent of Banks, the Legislature by chapter 772 of the Laws of 1933 added section 61-a to the Banking Law (Cons. Laws, ch. 2).

That section provides: "The superintendent, in his discretion, may permit a corporation * * * which is operating on a restricted basis pursuant to regulations promulgated by duly constituted authority, to resume business in accordance with a plan of reorganization under which depositors and other creditors will receive less than the full amount of their claims and /or in partial payment thereof will receive certificates of beneficial interest in certain segregated assets and /or stock of such corporation, and under which stockholders will contribute their shares of capital stock and /or money in lieu of assessments upon such stock. In any such case in which the superintendent permits resumption of business pursuant to such a plan of reorganization, all depositors and creditors and stockholders of any such corporation, whether or not they shall have consented to such plan of reorganization, shall be fully and in all respects subject to and bound by its provisions, and claims of all depositors and other creditors shall be treated as if they had consented to such plan. * * *" The statute then provides that the plan of reorganization must in the opinion of the Superintendent be fair and equitable to all depositors and other creditors and stockholders and in the public interest and, before it can become effective, must receive the consent of depositors and other creditors representing at least "eighty per centum in amount of its total deposits and other liabilities, exclusive of the claims of depositors and other creditors which will be satisfied in full under the plan of reorganization" and also the consent of stockholders owning at least two-thirds of its outstanding capital stock. Even then, "permission to resume business under any such plan of reorganization shall be granted by the superintendent only upon an order of the Supreme Court," made after notice to "depositors, creditors and stockholders."

Pursuant to the provisions of the statute, a plan of reorganization was prepared. It received the consent of

the required number of depositors, creditors and stock-holders, and was approved by the Supreme Court after numerous hearings. The plaintiffs appeared specially in these proceedings and filed an affidavit in opposition to the proposed plan, objecting to the "power or authority" of the court to "act" in the matter, on the ground that the statute was unconstitutional and that the plan promulgated thereunder would result in the impair-ment of the agreement of the defendant bank to pay them the full amount of their deposit on demand.

It cannot be questioned that, prior to the adoption of the plan, the defendant bank had assumed an obligation to pay to the plaintiffs, on their demand, the amount deposited in the bank. That obligation could be per-formed according to its terms only so long as the bank continued to do business. The right of a corporation to conduct a banking business has at all times been subject to reasonable regulation by the State. Its business always has been subject to examination and supervision by the Banking Department. If in the opinion of the Superintendent of Banks a corporation which had been authorized to conduct a bank, could not continue its business with safety, the State might interpose its power and command it to cease doing business. That command might be final and immediate or it might be conditioned upon the failure of the corporation to comply with sug-gestions or directions of the Superintendent, calculated to restore its stability. All obligations of the bank were qualified by the implied condition that the State might interpose and render exact performance by the bank impossible. The bank, though closed, would even then remain a debtor, and the debt might be collected in liquidation proceedings in accordance with the Banking Law. Here, as we have said, the bank had been permitted to reopen, after the so-called "banking holiday" of March, 1933, but subject to restrictions which precluded, at least temporarily, performance of its obligation to the

plaintiffs. The right of the State to impose such restrictions has never been challenged by the plaintiffs, and is not challenged now. They challenge here the right of the State to compel them, without their consent, to accept from the bank, reorganized in accordance with the statute, payment of the bank's indebtedness different in form and value from the payment which otherwise would be due to them; and which they might have obtained, in whole or in part, upon liquidation of the bank if it had not been reorganized.

The closing and liquidation of a bank almost inevitably produces economic injury in many directions, and may bring widespread ruin. It injures the community which has been accustomed to look to the bank as a source of credit for legitimate enterprises. It injures the borrowers who have obtained credit from the bank and who may not be able to repay their loans promptly if further credit is withheld and not obtainable elsewhere. Liquidation, too, results in a destruction of economic values to the injury of depositors or stockholders or both; for it cannot be doubted that the value of the assets of a going bank cannot be fully realized upon a forced liquidation, and that the amount which can be collected upon doubtful loans by a bank in the ordinary course of its business is greater than the amount which can be collected by a liquidation of the bank. Thus when the stability of a bank has become so impaired that public confidence in it is disturbed or the State determines that it cannot with safety continue to do business, the welfare of the community and of the creditors and stockholders of the bank is promoted if creditors and stockholders agree upon a plan of reorganization fair to all concerned, by which the bank, with additional capital and reduced liabilities, may be enabled to continue its business with safety.

Here more than four-fifths of the depositors and other creditors, and more than two-thirds of the stockholders, have agreed upon a plan of reorganization, and, after

hearing objections, the Supreme Court has approved the plan as fair to all and in the interests of the public. The plan contemplated that the liabilities of the bank, excepting special trust accounts and deposits preferred by statute, should be reduced by forty-five per cent, and new capital obtained so that the reorganized bank should " have an unimpaired Capital and Surplus at least equivalent to the present book Capital and Surplus." The method by which that result was accomplished is somewhat complicated. We shall state it only in barest outlines.

The reduction of forty-five per cent in the amount of the ordinary deposits was to be accomplished by the sale, to the depositors, of stock in the reorganized bank to the extent of one-quarter of such forty-five per cent and by the delivery to the depositors of certificates of beneficial interest, amounting to three-quarters of such forty-five per cent, in certain tangible segregated assets of doubtful value which were to be " eliminated from said Trust Company and set over into a fund known as the Community Recovery Fund." The increase of capital was to be obtained by the surrender by the stockholders of their stock " together with an agreement on the part of the present stockholders to pay $3 per share as a contribution to the assets of the said Trust Company as reorganized." The capital stock of the bank was originally divided into 75,000 shares of the par value of twenty dollars each. Under the plan of reorganization the capital stock of the bank was to be 150,000 shares of ten dollars each. One share of the new capital stock of the par value of ten dollars was to be issued to the old stockholders for each share of the par value of twenty dollars which had been surrendered, " with the understanding, however, that said new stock, to wit: 7,500 shares, shall be held in escrow with a trustee for the benefit of the said depositor-certificate-holders in the event that there be any deficiency in the recovery to the said

depositor-certificate-holders." The remainder of the stock in the reorganized trust company (with the exception of the stock sold to depositors as above provided) was to be sold to the public for at least twelve dollars and fifty cents or two dollars and fifty cents per share more than its par value. The plan provided, in addition, for the sale of "Capital debentures" in the sum of $1,500,000 to the Reconstruction Finance Corporation of the United States.

The plan was put in operation with the consent of the great majority of those directly interested and with the approval of the Supreme Court. The bank as reorganized with new capital and reduced liabilities was permitted to do business without restrictions. On the first day after the restrictions were removed, plaintiffs drew out fifty-five per cent of the amount of their deposit, as they were entitled to do under the plan of reorganization. They did not voluntarily accept the certificate of beneficial interest in the segregated doubtful assets, or the stock in the bank which under the plan of reorganization they were entitled to receive in payment or satisfaction of the remainder of the bank's indebtedness to them. Instead, they drew a check for the remainder of the amount which had been deposited by them in the bank; and upon the bank's refusal to pay the check, they brought this action. All the facts which we have stated in this opinion are disclosed by the pleadings, amplified by bills of particulars. By motion for judgment on the pleadings, both sides have challenged the legal consequences of the facts alleged in the pleadings, and judgment has been granted in favor of the defendant, dismissing the complaint.

It may be conceded that in the absence of a statute, a plan of reorganization of a bank could not be made binding upon any depositor who did not voluntarily consent to it. The purpose and result of the plan may be beneficial to all directly concerned and may avert a threatened disaster to the community. None the less it does change, in some degree, the contractual rights and obligations of

the parties, and such change can be effected only by unanimous agreement or by provision of law. A single depositor might selfishly interpose objections for the purpose of preserving rights which he may, though mistakenly, deem beneficial to himself, or even for the purpose of extorting an unfair benefit to himself as the price of withdrawing his objections. In that way the desire of the majority to arrange a plan which will benefit all may be thwarted. The purpose of the Legislature in enacting chapter 772 of the Laws of 1933 is clear. The statute was intended to prevent a small minority from blocking a fair and equitable plan of reorganization which has received the consent of the majority of those interested and the approval of an informed court, after a hearing. Undue insistence upon strict performance of a contractual obligation may be unfair to others and may be opposed to the general welfare. None the less, the curtailment of any right to insist upon the letter of a bond involves, in some degree, the impairment of a contractual obligation, and the Constitution of the United States (Art. I, § 10) prohibits any State from impairing such obligations. Even though the statute may be reasonably calculated to remedy a condition which, especially during a period of sudden and widespread economic depression, threatens the stability of economic values and the general welfare, the question still remains whether, when the Legislature adopts that remedy, it does not transcend the restriction placed upon the power of the State by the Constitution.

The constitutional restriction is not intended to remove completely from the field of legislative power all rights derived from contract. To promote the general welfare, it may at times impose a reasonable restriction upon freedom to exercise a right derived from contract in form or manner which will bring injury to others. (*Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S. 398.) That is true, especially when the statute is not intended to relieve a debtor from his obligations, but is intended to permit

creditors to take united action, consistent with the public interest, for the collection of their debts or the protection of their rights, in spite of the insistence of a minority upon a different course. (*Matter of People* [*Title & Mortgage Guarantee Co.*], 264 N. Y. 69. Cf. *Doty* v. *Love*, 295 U. S. 64.) The plaintiffs recognize the force of these decisions. They direct their attack rather against the plan adopted pursuant to the statute than against the statute itself. They urge that the plan impairs their contractual rights in manner and form which the State could not authorize and that the statute may not be so construed as to permit the approval of a plan which will have such effect and that, if so construed, it is unconstitutional.

The plaintiffs cannot now successfully attack the plan of reorganization on constitutional grounds, even if we should assume that the statute or plan is vulnerable to such attack; for the plaintiffs have already availed themselves of some of the benefits of that plan. Until the Superintendent gave the bank permission to resume business under that plan, without restrictions, the depositors' right to demand payment of the amount of their deposits was suspended, and their remedy was dependent upon a reorganization of the bank or its liquidation in accordance with the Banking Law. If reorganization took place, then they could collect the debt due to them only in accordance with the terms of the plan of reorganization; if liquidation took place they could collect their indebtedness only out of the moneys available for that purpose. Through the plan of reorganization the bank was enabled to obtain new capital and was permitted to resume business, and the plaintiffs obtained an immediate right to payment of fifty-five per cent of the indebtedness due them, in addition to other benefits, in substitution for a remedy which, at some time in the future, might result in the collection of a sum, which cannot now be determined, in satisfaction of their indebtedness. The plaintiffs, though consistently objecting to the plan

of reorganization, withdrew from the bank, on the first day that the bank was permitted to resume business without restrictions, under the plan of reorganization, the full amount to which they were entitled under that plan. In that way they availed themselves of the benefit of the plan. If that plan unlawfully impaired their contractual rights, they had the right to deny its validity and to assert their rights, unimpaired by the plan, but they could not claim and receive some of the benefits of the plan without losing their right to attack it thereafter on constitutional grounds.

It is true that the only benefit which the plaintiffs have claimed and received was the immediate payment of a portion of an indebtedness which would, concededly, have been due to them even if no plan of reorganization had been adopted. Though the debt was then due, it would not have been collectible upon demand, from the bank, at that time, or even at the present time, if the plan had not been adopted and the bank had not been permitted to resume business under the plan. Thus the plaintiffs, before bringing this action, have availed themselves of some of the benefits of a plan of reorganization which they now ask the court to treat as invalid and, in this action, they base their cause of action upon a refusal of the bank to pay out moneys which, except for the plan of reorganization, the bank could not have paid out lawfully, and they seek a recovery payable out of the assets of a bank which obtained additional assets under the plan of reorganization, and for the purposes of such reorganization. It is well established that no cause of action based on a foundation so shifting can be sustained.

In many cases in this and other jurisdictions, the courts have refused to permit a creditor to attack the validity of an insolvency statute, after the creditor has availed himself of the statute for the collection of a portion of the indebtedness due him. (*Van Hook* v. *Whitlock*, 26 Wend. 43; *Clay* v. *Smith*, 3 Pet. [U. S.] 411; *Eustis* v. *Bolles*, 146

Mass. 413; *Murray* v. *Roberts*, 150 Mass. 353; *Fogler* v. *Clark*, 80 Me. 237.)   Though in all these cases the statute under attack was an insolvency or bankruptcy statute, the principle underlying these decisions applies equally here where the statute and the plan of reorganization adopted pursuant to the statute were intended to permit a bank and its creditors to agree upon a plan whereby without liquidation proceedings creditors might receive " less than the full amount of their claims " and the " stockholders will contribute their shares of capital stock and /or money in lieu of assessments upon such stock." (Banking Law, § 61-a.)   The statute is at least analogous to an insolvency statute (Cf. *Doty* v. *Love*, 295 U. S. 64), and the plan of reorganization is in effect a composition agreement.  Contribution by the stockholders of their shares of stock and money in lieu of assessments creates a fund which might not otherwise be available to creditors in insolvency proceedings.   The agreement of stockholders and of creditors was obtained because the statute purported to give to such an agreement a binding effect even upon creditors who objected to it.   The purpose of the agreement would be thwarted if such a creditor could avail himself of the attempted composition by withdrawing his share of the assets and then hold the corporation liable for the remainder and satisfy any recovery against the corporation out of assets which are, in part at least, the fruits of the composition.   " The plaintiffs could not avail themselves of the advantages resulting from the proceedings [for reorganization] without submitting themselves to the consequences which the law imposes on such creditors."   (*Murray* v. *Roberts*, *supra*, p. 355.)

" Where a constitutional provision is designed for the protection solely of the property rights of the citizen, it is competent for him to waive the protection, and to consent to such action as would be invalid if taken against his will."   (1 Cooley on Constitutional Limitations [8th ed.],

p. 368.) In spite of protests, the plaintiffs have received benefits and are now demanding other benefits which they could not have obtained if the plan of reorganization had not been adopted. They cannot assert the invalidity of the proceedings and at the same time share in the benefit resulting from such proceedings. That conclusion is based upon well-recognized principles of fairness and justice, and in accord with an unbroken line of judicial authority. It is immaterial whether we classify these principles in the category of estoppel or of waiver or of implied consent.

The judgment should be affirmed, with costs.

CRANE, Ch. J., O'BRIEN, HUBBS, LOUGHRAN and FINCH, JJ., concur; CROUCH, J., not sitting.

Judgment affirmed.